UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:22 CR 71 SNLJ (ACL) |
| | ) |
| RICHARD J. BERRY, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Defendant Richard J. Berry's Motion to Suppress Illegally Obtained Evidence (Doc. 26) was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

On December 8, 2021, Probation Officers (POs) conducted a court-approved search of Defendant Richard J. Berry's residence. Berry was on supervised release and his PO suspected Berry was in possession of electronic devices that had not been approved by the Probation Office. Numerous electronic devices were seized from Berry's bedroom and a spare room that was utilized as an office. A forensic examination of some of the devices that were seized[1] revealed that the devices contained child pornography.

Berry faces revocation of his supervised release because his PO believes Berry violated conditions of release, including special conditions 1) that he not possess or use computers and data storage devices without approval by his PO, 2) that he failed to advise his PO of all computer and electronic devices, which might include cell phones, that he possesses or has

---

[1] The items seized are listed in Defendant's Exhibit A. *See* Doc. 26-1. Berry requests that items numbered 2, 10, 22, 23, 24, 26 (along with three internal storage drives), 27, 29, and 32 be suppressed. *Id*.

Page **1** of **12**

access to within 24 hours of obtaining them, and 3) that he not access the Internet except for reasons approved in advance by his PO. There is also a new Indictment pending against Berry for Receipt of Child Pornography beginning at an unknown time but including between on or about July 22, 2021, and December 6, 2021.

Berry claims that "[o]ne of Mr. Berry's adult roommates had been given permission to have computers and electronic communication and data storage devices in the home so long as he possessed the items and password protected the devices." (Doc. 26 at 3.) Furthermore,

> [a]t the time of the search of Mr. Berry's residence, there was no evidence Mr. Berry possessed the seized items and/or had accessed them himself. There was no evidence Mr. Berry had accessed the internet without permission or violated the terms of his supervised release.

*Id*.

The Government responded that the issue is whether there was reasonable suspicion that "evidence of a violation of a condition of release" would be found. (Doc. 28 at 6, quoting *United States v. Makeef*, 820 F.3d 995, 1001 (8th Cir. 2016) (emphasis in original)). Applying *Makeef* to the instant facts, the Government argued that the PO's observation of numerous unapproved devices in common areas of Berry's home on September 23, 2021, and November 18, 2021, provided the requisite reasonable suspicion for the search condition that was executed on December 6, 2021. (Doc. 49 at 14-15.)

In consideration of the pleadings and evidence submitted by the parties, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that the request for suppression be denied.

## I. Findings of Fact[2]

In December 2018, Berry pled guilty to one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Docket No. 1:18CR- 00051 SNLJ. Berry was subsequently sentenced to serve a 24-month term in the Bureau of Prisons (BOP), to be followed by a 10-year term of supervised release. The supervised release term commenced in November 2020 following his release from custody. Among the standard conditions of supervision, Berry was required to "allow the probation officer to visit [him] at any time at [his] home or elsewhere, and … permit the probation officer to take any items prohibited by the conditions of [his] supervision that [the officer] observes in plain view." Gov't Exh. 1 (Judgment) at 4. Berry was also subject to a host of special conditions while on supervised release, including what is commonly referred to as a "search" condition. That condition specifically states:

> You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation office may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation.

*Id*. at 5. Other relevant restrictions included a condition that Berry was not allowed to possess any computers or other electronic data storage devices without the express approval of the Probation Office, nor was he allowed to access the internet without same. *Id*. Berry was also required to notify "the probation office of all computer, electronic equipment, and web enabled equipment, including cell phones, to which he possesses or has access within 24 hours of obtaining same." *Id*.

---

[2] The Court's "Findings of Fact" are taken from the Government's statement of "Facts" in its response brief (Doc. 49 at 2-10) as Berry acknowledges it is factually correct (Doc. 54 at 1).

At the evidentiary hearing, PO Doerge explained that PO Kathy Hollenbeck was originally assigned as Berry's supervising officer when he began his term of supervised release in November 2020. Transcript of Hearing (hereafter "Tr.") at 6. In September 2021, PO Doerge was reassigned as Berry's supervising officer following PO Hollenbeck's retirement. *Id*. PO Doerge already had some familiarity with the case, as he had accompanied PO Hollenbeck on a standard "pre-release home inspection" before Berry began his term of supervision. *Id*. at 11-12. PO Doerge explained that one of the reasons for these inspections is to make sure "there's nothing in that residence that … would be a violation of the conditions of supervised release." *Id*. at 12. And in the event there are other individuals who will be residing in the home with the offender, the Probation Office speaks with all such individuals to "assure that they don't have … any issues that would cause violations of the term of supervised release and to let them understand what the conditions are as well." *Id*.

During the pre-release home inspection of Berry's residence, PO Doerge testified that he and PO Hollenbeck met with Geoffrey Rudert—Berry's boyfriend with whom he was going to be cohabitating. *Id*. at 13. PO Doerge recalled that Rudert "became very emotional" when he was advised of the restrictions on the presence of computers and electronic devices in the residence. *Id*. at 13-14. Although the restrictions were stringent, the Probation Office did authorize Rudert to possess a single "computer tower" on the condition "that it be password-protected" so that Berry would not be able to access or use it. *Id*. at 14. The Probation Office did not authorize any other computers or electronic devices to be present inside the residence—aside from a flip-phone issued to Berry that had no internet connectivity. *Id*. at 14-15.

PO Doerge testified that when he was first assigned to Berry's case, he "looked over the case quickly to familiarize [him]self with what was going on." *Id*. at 17. He then "conducted

Page **4** of **12**

an initial home contact" on September 23, 2021. *Id*. Berry was still residing with Rudert at the time. *Id*. PO Doerge testified that when he "made [his] walk through of the home, [he] noted a large number of electronic devices ... capable of accessing the internet." *Id*. PO Doerge specifically described that:

> There were devices in almost every room of the home that I noticed. The easiest way I could explain it when I got back to the office was it looked like the back room of a computer store. There were parts of computers sitting around. There were cell phones sitting around. There were thumb drives sitting around.

*Id*. at 18. When PO Doerge mentioned the presence of these devices, Berry replied that "he didn't believe that condition was enforceable" because even "his thermostat had the ability to access the internet." *Id*. PO Doerge further described an "old school iPod" he observed in Berry's bedroom. *Id*. PO Doerge explained that this particular device captured his attention because this type of iPod is commonly sold to inmates in federal prisons. *Id*. at 18-19. Although they are sold in prisons, PO Doerge stated that sex offenders are still prohibited from possessing them because they have the capability to store images. *Id*. at 19.

PO Doerge testified that, with the exception of Rudert's password protected computer tower, the Probation Office was never notified about the presence of the large volume of prohibited devices he observed in plain view throughout the residence. *Id*. at 19-20. PO Doerge further testified that, based on Standard Condition Number 6, he could have seized any and all of these devices during the home inspection on September 23. *Id*. at 20. But PO Doerge explained that there were "two main reasons" he chose not to seize the items at the time. *Id*. First, PO Doerge stated that he "wanted to go back and review Mr. Berry's case again, review those conditions again and assure that I wasn't doing something that was out of line." *Id*. Secondly, PO Doerge stated that "there were so many items that [he] didn't have the manpower, nor did [he] have the transportation abilities to get everything out of that house." *Id*.

For those reasons, PO Doerge went back to the Probation Office and "reviewed the case file and its conditions." *Id*. After confirming that the Probation Office had never been notified about the presence of these numerous devices, PO Doerge testified that he certainly believed reasonable suspicion existed that Berry was in violation of the terms of his supervised release. *Id*. at 21. PO Doerge reported his findings back to his supervisor. Discussions were then held about assembling the Strategic Response Team (SRT) to execute the search condition of Berry's supervised release. *Id*. at 21-22.

PO Doerge explained that the SRT consists of "a number of officers between the Cape Girardeau and St. Louis offices that have a secondary responsibility of conducting searches," and that members of the team "go through specific training on collection of evidence." *Id*. at 67. PO Doerge further explained that the Probation Office does not "have the availability to do them all the time," and they can only "schedule a certain number of them." *Id*. Additionally, cases involving dangerous situations or exigent circumstances will get prioritized and "kicked up on the list." *Id*. Because Berry's case did not involve any specific or articulable risk of danger to other persons, it took some time to get it scheduled. *Id*. at 68.

While the SRT search was in the process of being arranged, PO Doerge made another home contact with Berry on November 18, 2021. *Id*. at 22. Much like the previous home contact, PO Doerge observed numerous unauthorized electronic devices throughout the residence. *Id*. at 23 (testifying that "there was an equal number of items, if not more, in the house at that time"). Explaining why he felt this established reasonable suspicion, PO Doerge emphasized that many of these items were "out in the open" in common areas of the residence, which provided Berry with an opportunity to access them. *Id*. at 53, 55. And because none of these devices had even been disclosed to the Probation Office—which was a violation in-and-

of itself—there was no way to know if any of them were password-protected. *Id*. The area surrounding Rudert's approved computer tower also caught PO Doerge's attention. PO Doerge described that he noticed "a number of passwords that were now written down on sticky notes that were stuck on the credenza … directly above the computer." *Id*. at 22.

After confirming the presence of unauthorized devices throughout Berry's residence, the Probation Office decided to "move forward with the full search of the residence pursuant to the search condition." *Id*. at 23. Before assembling the SRT, the Probation Office notified District Judge Stephen N. Limbaugh, Jr., the original sentencing judge, of their plans to execute the search condition. *Id*. at 24. Judge Limbaugh did not "express any hesitation or concern about the plan moving forward." *Id*. PO Doerge reiterated that, while he already believed there was sufficient reasonable suspicion to trigger the search condition, Judge Limbaugh's approval of the plan only served to reinforce this conclusion. *Id*.

The SRT was assembled to execute the search of Berry's residence on December 8, 2021. Berry was present at the residence at the time of the search. *Id*. at 25. PO Doerge testified that he first made contact with Berry at the front door and immediately "noticed that he was wearing a smart watch" on his wrist. *Id*. at 26; Gov't Exh. 3, item no. 1 (Samsung Galaxy Gear S3). Berry did not have permission possess such a device because it was capable of accessing the internet. *Id*. PO Doerge reiterated that he had never given Berry permission to access the internet at any time for any reason. *Id*. at 31.

The search of the residence then commenced. PO Doerge testified that the officers discovered numerous unapproved items throughout the home. *Id*. at 27. In the end, a total of 41 items were seized. *Id*. at 27-28; Gov't Exh. 3 (listing all 41 items along with a description of the locations where they were found). When officers informed Berry that a total of 41 items

were being seized, PO Doerge recalled that Berry stated: "That's almost all of our devices." *Id*. at 32.  With the exception of Rudert's computer tower and Berry's flip-phone, the Probation Office was never notified about the presence of these items being in the residence. *Id*. at 28-29.

During his testimony, PO Doerge specifically described the search of Berry's bedroom, where they found an unlocked "fire safe under his bed." *Id*. at 29.  A Samsung Galaxy S7 mobile phone was discovered inside the safe, which was charged and powered on at the time. *Id*.  There were also various papers, forms, and identification cards belonging to Berry inside the safe, including his social security card and an Eagle Scout card. *Id*. at 29-30; Gov't Exhs. 4-6 (photographs).

Among the probation officers present for the search was Steve Holmes, "the supervisor of [the] forensic analysis lab." *Id*. at 25.  A forensic examination was later performed on all of the seized electronic devices. *Id*. at 33-34; Gov't Exh. 9 (18-page report).  The Samsung Galaxy S7 phone discovered under Berry's bed was found to contain, among other things, 146 still images and 16 video files of confirmed child pornography. *Id*. at 33; Gov't Exh. 2 (petition outlining evidence discovered on phone).

Berry notes that "suppression of the material found on the devices because the search violated the Fourth Amendment w[ould] result in the suppression of child pornography and cause the new indictment for that possession to be dismissed." (Doc. 54 at 6-7.)

## II.  Conclusions of Law

Berry and the Government agree the dispute regarding the search of his residence and devices is "whether the officers. . .had reasonable suspicion evidence of a violation of a condition of release would be found during the search of either the residence and/or the devices seized."  (Doc. 54 at 1; Doc. 49 at 14.)

### II.A. Reasonable Suspicion for violation of supervised release condition

The Government cited the landmark case of *United States v. Knights*, 534 U.S. 112 (2001), which "held that a warrantless search of a probationer's apartment, supported by reasonable suspicion and authorized by a condition of his probation, was reasonable within the meaning of the Fourth Amendment." (Doc. 49 at 10.) The holding reiterated the longstanding principle that "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 118–19 (citing *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). In contrast to probation, federal supervised release "'is meted out in addition to, not in lieu of, incarceration.'" *Samson v. California*, 547 U.S. 843, 850 (2006) (quoting *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002)).

The Eighth Circuit has determined that, although a supervised release term may not "explicitly state that the probation officers could search [a defendant's] personal effects[, it] is not dispositive" of whether reasonable suspicion exists. *United States v. Makeeff*, 820 F.3d 995, 1002 (8th Cir. 2016). In *Makeeff*, the defendant, Makeeff, was serving a term of supervised release upon being convicted and imprisoned for possession of child pornography. *Id.* at 997.

The search provision in Makeeff's case stated:

> [D]efendant shall submit to a search of his person, residence, adjacent structures, office or vehicle, conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the residence or vehicle may be subject to searches pursuant to this condition. This condition may be invoked with or without the assistance of law enforcement, including the U.S. Marshals Service.

*United States v. Makeeff*, No. 414CR00081SMRCFB, 2015 WL 13284966, at 3 (S.D. Iowa Feb. 6, 2015), aff'd, 820 F.3d 995 (8th Cir. 2016). Upon receiving a tip that Makeeff "bragged about

using a computer and possessing child pornography," Makeeff's probation officers conducted a home visit and noticed a USB drive sitting on a table. *Makeeff*, 820 F.3d at 998. "Makeeff initially denied ownership of the USB drive and stated that he had no knowledge as to the USB drive's contents," *id.*, claiming it belonged to his wife.  However, Makeeff's wife also denied ownership of the drive.  The probation officers seized the drive and left.  Makeeff then called the probation officers and admitted it contained child pornography, which a forensic analysis confirmed.  Makeeff claimed the USB drive should be suppressed because the probation officers lacked reasonable suspicion to search the contents.  In affirming the denial of Makeef's suppression request, the Eighth Circuit held there was reasonable suspicion for the probation officers to seize and search the USB drive.  The Court reasoned that, although the "supervised-release condition did not explicitly state that the probation officers could search Makeeff's personal effects," the search condition specifying that Makeeff's home may be searched, coupled with the tip, the drive being in plain sight, Makeeff's criminal history, and his admission to the violation, provided reasonable suspicion to search the contents of the drive.  *Id.* at 1002-03.

Berry argues that "the presence of a data storage device or computer" alone was not enough to create reasonable suspicion to conduct a search of Makeeff's USB drive, but the additional evidence gathered by Makeeff's probation officers "collectively created reasonable suspicion." (Doc. 54 at 2.)  Like Makeeff, Berry had a prior conviction for possessing child pornography, he was prohibited from viewing and possessing any pornography, and he was prohibited from accessing or possessing a computer without the probation office's approval.  The Eighth Circuit agreed that "the existence of the USB drive alone in Makeef's residence was sufficient to trigger reasonable suspicion." *Makeef*, 820 F.3d at 1001.  Even so, *Makeef*

determined that additional factors including a prior violation of viewing pornography, a tip that Makeef was again viewing child pornography, and the presence of a USB drive which could conceal prohibited images from discovery in his home "*collectively* created reasonable suspicion Makeef was once again viewing pornography—a violation of his supervised-release terms." *Id*. at 1002.

In this case, rather than observing just one prohibited device like the USB drive that was found in Makeef's home, Berry was found to be in possession of 41 electronic items indicating Berry had violated the special condition that he only possess electronic devices approved by his PO.  When the officers contacted Berry at the front door to begin the search, they immediately noticed Berry was wearing a smart watch (capable of accessing the internet) on his wrist although he had not been given permission to have the device.  There was also an unlocked fire safe under Berry's bed that contained a charged cellular phone and identification cards belonging to Berry.  When Berry was advised that a total of 41 items were being seized, Berry stated "That's almost all of our devices."  While not an admission regarding the contents of the devices that were seized, Berry acknowledged at least joint ownership of items he was prohibited from possessing.  Other than Berry's flip-phone and his roommate's computer tower, the Probation Office was never notified about the presence of the remaining electronic communication or data storage devices that were found within the residence.

An additional distinction from the facts in *Makeef* is that Berry's special conditions explicitly stated his storage devices and electronic communication devices may be searched when reasonable suspicion exists that he violated a condition of supervision and that the areas to be searched contain evidence of this violation.  Makeef did not have this condition.  Officer Doerge observed numerous items that had not been approved in Berry's residence on two separate occasions before the search.  Berry was wearing a smart watch when he answered the

door on the day of the search and the numerous unapproved items were once again observed in the residence.

Based on the foregoing, the searches of Berry's residence and the unapproved electronic communication or data storage devices were lawful.

### III.  Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Illegally Obtained Evidence (Doc. 26) be **denied**.

Further, the parties are advised that they have until not later than August 4, 2023, in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of July, 2023.